UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

S.S., individually and on behalf of T.S-W., a child with
a disability,

                            *Plaintiff,*

       -against-

NEW YORK CITY DEPARTMENT OF EDUCATION,

                            *Defendant.*
_____

**COMPLAINT**

Case No. 1:23-cv-01134

1.     This is an action brought pursuant to 20 U.S.C. § 1415 of the Individuals with Disabilities

Education Act ("IDEA"), and the federal and state regulations promulgated thereunder, as well as

42 U.S.C. §§ 1983, 12132, 12203.

## NOTICE OF RELATED CASE WITH PENDING RELATED MOTION

2.     In the U.S. District Court for the Southern District of New York, a determination of civil

case relatedness is governed by Rule 13(a) of the Division of Business Among District Judges.

3.     The above-captioned parties, in their same respective capacities and designations, are also

the only parties in *S.S., individually and on behalf of T.S-W., a child with a disability v. New York*

*City Department of Education*, S.D.N.Y. 1:20-cv-9394-VSB-JW.

4.     The State Review Officer ("SRO") decision (No. 22-114) at issue in this action addresses

the same multi-year dispute, over T.S-W.'s educational setting and whether and when an Impartial

Hearing Officer ("IHO") may order placement in a State-approved nonpublic school, that is at

issue in S.D.N.Y. 1:20-cv-9394-VSB-JW, albeit with this action being in the context of a different

Individualized Education Program ("IEP"), issued in March 2022, as part and during the course of

Case No. 211163.

1

5.     A determination is pending in S.D.N.Y. 1:20-cv-9394-VSB-JW, on appeal to that District Court from SRO decision No. 21-178, which involves several aspects of the State-approved nonpublic school placement and other programmatic relief requested in Case No. 211163 and, via SRO decision No. 22-114, this action, albeit with this action being in the context of the different March 2022 IEP instead of the IEPs at issue in SRO decision No. 21-178.

6.     Exhibits B (Doc. 34-2) and C (Doc. 34-3) to the S.D.N.Y. 1:20-cv-9394-VSB-JW Amended Complaint (Doc. 34) are, respectively, the due process complaint and amended due process complaint (Case No. 211163) underlying this action.

7.     The Amended Complaint in S.D.N.Y. 1:20-cv-9394-VSB-JW (Doc. 34) includes Causes of Action concerning:

    a.     a State-approved nonpublic school and other programmatic relief that S.S. has requested to result from annulment of the prior year's SRO decision (No. 21-178) (Tenth COA [¶¶ 241-246; *see also* ¶¶ 114, 122-123, 131-136]),[1] with the State-approved nonpublic school and several other items of programmatic relief being the same as requested from annulment of SRO decision No. 22-114 in this action;

    b.     T.S-W.'s pendency entitlements (First COA [¶¶ 170-175]), including for Case No. 211163 (¶¶ 124-169, 251);

    c.     alleged violations of law arising from the then-absence of an IHO (Fourth – Eighth COA [¶¶ 199-234]; *see also* ¶¶ 124-169, 251);

---

[1] As indicated by initial citation in paragraph "6" of this Complaint, all "¶¶" citations in subparagraphs "a" – "d" to paragraph "6" of this Complaint refer back to the Amended Complaint in S.D.N.Y. 1:20-cv-9394-VSB-JW (Doc. 34), and not to other paragraphs of this Complaint.

d.     S.S.'s claim for "prevailing party" fees for work in the impartial hearing (Case No. 211163) underlying this action (Eleventh COA [¶¶ 247, 251-261]).[2]

8.     On November 17, 2021, the parties entered into partial resolution agreement in Case No. 211163, for Defendant New York City Department of Education ("DOE") to fund an independent neuropsychological evaluation at a rate not to exceed $5,500.00, and for DOE to hold an IEP meeting. (*See* S.D.N.Y. 1:20-cv-9394-VSB-JW, Doc. 34, dated November 8, 2021, ¶¶ 149-151.)

9.     The independent neuropsychological evaluation and IEP meeting were both completed in March 2022.

10.    Case No. 211163 was consolidated with the due process complaint (225279) that disputed the March 2022 IEP.

11.    The parties, in their initial replies (and S.S.'s ordered supplemental briefing) on the pending motion on SRO decision No. 21-178, address the letter that DOE's Central Based Support Team ("CBST") sent to S.S. for placement in a State-approved nonpublic school under the March 2022 IEP. *S.S.*, S.D.N.Y. 1:20-cv-9394-VSB-JW, Docs. 68 (¶¶ 6-7), 74-1, 76 (6 of 9), 86 (5 of 5).

12.    It is foreseeable that decisions by different Judges would conflict in a manner that results in inconsistent rulings on some identical or near-identical factual and legal issues.

13.    Litigating the two cases before different Judges would be unnecessarily burdensome and duplicative of effort.

---

[2] Fee analysis typically utilizes the *Johnson* factors, which include likelihood for inter-case references in having a district court consider "preclusion of employment by the attorney due to acceptance of the case", "time limitations imposed by the client or the circumstances", and "the nature and length of the professional relationship with the client". *Arbor Hill Concerned Citizens v. Cnty. of Albany*, 522 F.3d 182, fn. 3 (2d Cir. 2008), *citing Johnson v. Georgia Hwy. Exp., Inc.*, 488 F.2d 714, 717-719 (5th Cir. 1974).

## JURISDICTION AND VENUE

14.     Jurisdiction is predicated upon 28 U.S.C. §§ 1331, 1343(a) in that claims are asserted under

the laws of the United States, including Acts of Congress (*i.e.,* 20 U.S.C. §§ 1400 et seq.; 42 U.S.C.

§§ 1983, 12132, 12203) providing for the protection of civil rights and relief thereunder.

15.     Venue is predicated upon 28 U.S.C. § 1391(b)(1) based upon the residence of DOE.

## PARTIES

16.     Plaintiff S.S. is the mother of T.S-W., a child with a disability who resides in the County

of Kings, State of New York.

17.     T.S-W. was born in 2013.

18.     T.S-W. is classified as a student with Autism.

19.     T.S-W. has been diagnosed with:

a.      "Autistic Spectrum Disorder, Level 3, requiring significant support without

intellectual impairment";

b.      "Social Pragmatic Learning Disorder";

c.      "Specific Learning Disorder with impairment in reading (with deficits noted in

comprehension) SEVERE";

d.      "Specific Learning Disorder with impairment in written expression including

spelling accuracy, grammar and punctuation, accuracy and organization of written

expression - SEVERE";

e.      "Specific Learning Disorder with impairment in mathematics: including number

sense, memorization of arithmetic facts, accurate or weak calculation, weak math reasoning

- SEVERE";

f.      "Attention Deficit/Hyperactivity Disorder, combined type".

20. Defendant DOE is a "local educational agency" as defined by the IDEA.

21. In its capacity as a "local educational agency" under the IDEA, DOE is a recipient of federal funding.

22. DOE has duties and obligations to students with disabilities, under and consistent with the IDEA, Articles 52-A and 89 of the New York State Education Law, and Federal and New York State regulations promulgated under those laws.

23. DOE's principal place of business is located at 52 Chambers Street, New York, NY 10007.

## RELEVANT BACKGROUND

**IHO Ajello's Findings and Decision**

24. T.S-W. regressed during his preschool years due to the absence of applied behavioral analysis ("ABA"), as found in Impartial Hearing Case No. 176049, Findings of Fact and Decision ("FOFD"), by Impartial Hearing Officer ("IHO") Daniel Ajello, at page 16.

25. DOE's general year-to-year IEP recommendations for T.S-W. have been:

    a.      Twelve-month program;

    b.      DOE specialized school ("District 75");

    c.      6:1+1 special education class;[3]

    d.      Speech-Language Therapy ("SLT") (3 x 30, 1:1; 2 x 30, group);

    e.      Occupational Therapy ("OT") (2 x 30, 1:1; 1 x 30, group);

    f.      Counseling (1 x 30, group);

    g.      Parent Counseling and Training ("PCAT") (workshops);

    h.      Either a toileting or a behavior paraprofessional;

---

[3] The sole outlier was T.S-W.'s November 2021 IEP. (P. Ex. H at 36.) It is unclear—and DOE did not offer an explanation—why DOE made this shift between the June 2021 and March 2022 IEPs, before evaluation.

i.    Transportation paraprofessional on specialized transportation;

j.    Since IHO Ajello's ordered 2019 assistive technology evaluation, a device.

26.    Upon a showing that two preschool IEPs and the Kindergarten (2018-2019) IEP did not offer T.S-W. a FAPE, IHO Ajello's FOFD found that deferral to DOE's Central Based Support Team ("CBST"), as of February 4, 2019, would be premature.

27.    IHO Ajello's February 4, 2019 FOFD ordered relief that included:

    a.    "compensatory academic services, in the form of 1,000 hours of home-based ABA services", which were "to be delivered from the date of this Order through 12/31/2020";

    b.    for the remainder of the 2018-19 school year, a full-time crisis paraprofessional and a toileting paraprofessional "to provide services based upon toileting goals";

    c.    reimbursement of a $11.91 expenditure by the Parent due to "the DOE's failure to provide adequate transportation to Student for the first weeks of school";

    d.    DOE-completed or independent evaluations (i.e., assistive technology, Autism Diagnostic Observation Schedule—Second Edition, psychiatric consultation, neurology consultation, and functional behavior assessment [FBA] with, if warranted by the FBA, a behavior intervention plan [BIP]), all completed and/or authorized for funding within thirty days of the FOFD;

    e.    "a CSE to review the above completed evaluations within ten days of receipt of evaluations and/or Parent request for an IEP meeting";

    f.    "an appropriate IEP that considers Student program consisting of:"

i. "Forty (40) hours per week of in-school and at-home ABA services, by a licensed behavior analyst and/or board certified behavior analyst (BCBA)";

ii. "a structured, multisensory special education program with a limited student to teacher ratio with expertise in an early-grade remediation of reading, writing, and math deficits, for students with a history of autism spectrum symptoms, inattention-hyperactivity, information processing, neurocognitive, and intellectual deficiencies, anxiety symptoms, social and behavioral, adaptive functioning, and associated learning difficulties, for a better-focused and personalized instruction";

iii. "[c]ounseling services consistent with the recommendations made in the new evaluations and the 2018 neuropsychological evaluation, such as cognitive-behavioral, culturally-informed, childhood-oriented psychotherapy, with the use of ABA principles";

iv. "Individual OT twice weekly for 30 minutes (1:1, 2 x 30)";

v. "OT with a group of two once weekly for 30 minutes (2:1, 1 x 30)";

vi. "Individual SLT thrice weekly for 30 minutes (1:1, 3 x 30)";

vii. "SLT with a group of 2 twice weekly for 30 minutes (2:1, 2 x 30)";

viii. "Individual PT twice weekly for 30 minutes (1:1, 2 x 30)";

ix. "5 hours monthly of ABA PCAT by the BCBA who supervises the in-home ABA provider";

x. "A full-time 1:1 toileting paraprofessional";

xi. "A full-time 1:1 crisis paraprofessional";

xii.   "Specialized transportation, with a paraprofessional who will provide appropriate door-to-door transitional services";

28.   Designations of "1:1" and "2:1" refer to the student-to-provider ratio.

29.   Designations of "1 x 30", "2 x 30", and "3 x 30" refer to a number of sessions, each being 30 minutes in duration.

30.   S.S. has made allegations and claims concerning the non-implementation are ongoing and/or stayed in *S.S., individually and on behalf of T.S-W., a child with a disability v. New York City Department of Education*, S.D.N.Y. 1:20-cv-9394-VSB-JW.

**IHO Cohen's First Decision (Case No. 197120)**

31.   After IHO Ajello's February 4, 2019 FOFD, DOE's next IEP meeting for T.S-W. was on September 19, 2019, for T.S-W.'s First Grade (2019-2020) school year.

32.   T.S-W.'s September 19, 2019 IEP did not address ABA (or other research-based methodologies), the recommended program, or having both paraprofessionals, although it did result in ordered PT services being added to the IEP with adaptive physical education.

33.   Almost two weeks after the September 19, 2019 IEP meeting, Anne Denor, Psy.D. completed IHO Ajello's ordered ADOS-2 and a neuropsychological evaluation, with reports thereof submitted directly to DOE's Special Education Student Information System ("SESIS").

34.   Dr. Denor's reports included recommendations for an educational setting with evidence-based behavior interventions (with mention of ABA) and social communication curricula, certified specialists familiar with students of similar disabilities, a low student-to-teacher ratio in a classroom with children of similar cognitive and academic levels, and intensive, individual instruction.

35.     After the September 19, 2019 IEP, DOE's next IEP meeting for T.S-W. was on June 12, 2020, for T.S-W.'s Second Grade (2020-2021) school year.

36.     Without prior-or-then-disclosed support, the June 12, 2020 IEP replaced T.S-W.'s door-to-door transition with "closest safe curb" and added annual "Mandated Reporter Training", "Progress Monitoring Training", and "Positive Behavior Intervention Strategies Training", all in 60-minute group sessions.

37.     S.S. initiated Case No. 197120, concerning T.S-W.'s First Grade (2019-20) and Second Grade (2020-21) school years, including the associated September 2019 and June 2020 IEPs.

38.     In Case No. 197120, the parties agreed that the program in IHO Ajello's February 4, 2019 FOFD was pendency.

39.     On November 10, 2020, *S.S., individually and on behalf of T.S-W., a child with a disability v. New York City Department of Education*, S.D.N.Y. 1:20-cv-9394-VSB-JW, was commenced, in part, upon claims concerning the absence of an IHO to hear Case No. 197120.

40.     After an IHO (Diane Cohen) was appointed in Case No. 197120, DOE did not present a case, submit any evidence, cross-examine any affiants, or object to the relief requested, except as to the potential for duplication of compensatory services, for which additional days of hearing were held.

41.     Before completion of the hearing in Case No. 197120, DOE held the next IEP meeting on June 10, 2021.

42.     At the June 10, 2021 IEP meeting, DOE recommended removing the PT and "Mandated Reporter Training"

43.     At the June 10, 2021 IEP meeting, DOE recommended adding "School Nurse Services" and sixty minutes of assistive technology training.

44.     Between July 12, 2021 and July 15, 2021, the parties addressed S.S.'s motion at the federal level (1:20-cv-9394-VSB-JW) for the Court to enforce pendency.

45.     On July 16, 2021, IHO Cohen issued an FOFD, finding DOE failed to offer FAPE for the 19-20 and 20-21 SYs, pendency "did not cover" the 19-20 SY, and related services prior to December 3, 2020 are not considered provided.

46.     IHO Cohen's FOFD ordered:

a.      "DOE shall fund/provide the following, less any services which were already provided through pendency for [the 2019-2020 and 2020-2021] school years: 210 hours of SLT, 126 hours of OT, 84 hours of PT, and 1,680 hours of ABA";

b.      "[A]ny related services provided during he 2020-2021 school year, prior to December 3, 2021…shall be owed to the Student as make-up services";

c.      "DOE shall fund an FBA at a cost of up to $140 per hour, not to exceed a total of $1,500, as ordered in the interim order";

d.      "DOE shall continue to fund the Pendency Program until an appropriate IEP is developed. In the event that the DOE does not have an appropriate school in which to implement the pendency program, they shall place the Student in an appropriate non-public school until an appropriate IEP is developed."

**First SRO Decision (Case No. 197120, Appeal No. 21-178) and IHO Cohen's Second Decision (Case No. 211163)**

47.     Also on July 16, 2021, S.S. initiated due process hearing Case No. 211163, by filing a due process complaint alleging denial of a FAPE for the 2021-22 school year.

48.     On July 21, 2021, IHO Cohen recused from Case No. 211163, stating "I have already submitted my decision in the prior case[] and there is no need for an order on consolidation[;] I am not available".

49.     On July 21, 2021, DOE changed its appointment notice to appoint "NO APPOINTMENT".

50.     On August 2, 2021, following S.S.'s motion in this action for enforcement of T.S-W.'s pendency program, the 1:20-cv-9394-VSB Court endorsed a Stipulation and Order (ECF 32) between the parties, memorializing DOE's obligations concerning pendency under IHO Ajello's FOFD until a pendency-changing event.

51.     On August 24, 2021, S.S. submitted a New York State Education Department ("NYSED") complaint concerning the DOE's failure to assign a teacher holding the appropriate certification to teach students with disabilities of T.S-W.'s age and grade level for the Summer 2021 session.

52.     On August 25, 2021, DOE appealed only the last order contained in IHO Cohen's FOFD in Case No. 197120, to the Office of State Review, alleging that: (i) "The IHO could not order the DOE to continue pendency beyond the date of her final decision"; and (ii) "The IHO could not order the DOE to place the student in a non-public school".

53.     DOE's appeal was designated SRO Appeal No. 21-178.

54.     On August 31, 2021, S.S. answered and cross-appealed, alleging that: (i) "Any challenge to IHO Cohen's Order continuing the program that underlied pendency must be denied as moot"; (ii) "the IHO did not err in ordering DOE to continue the program at P. Ex. C until an appropriate IEP is developed"; (iii) "the IHO did not err in ordering, absent an appropriate DOE school to implement the ordered program, DOE to place T.[S-W.] in an appropriate non-public school until an appropriate IEP is developed"; and (iv) "IHO Cohen erred in not ordering evidentiarily-supported IEP mandates constituting T.[S-W.]'s minimum necessary services for FAPE, based upon the erroneous finding that the 2021-2022 SY was not before her."

55.     On September 24, 2021, SRO Justyn P. Bates issued a decision declining to procedurally dismiss the Answer and Cross-Appeal, finding that IHO Cohen's last order in her FOFD would

have improperly extended pendency, declining to address whether IHO Cohen had authority to place T.S-W. in a non-public school, and finding that a program for the 2021-22 school year would have gone beyond Congress' intent.

56. While the NYSED complaint remained pending, DOE did not provide classroom instruction to accompany his ABA.

57. Also while the NYSED complaint remained pending, Dr. Tsiris reported various instances of DOE staff ignoring T.S-W.'s IEP mandates, with some leading to physical danger and injury.

58. Throughout September and October 2021, the DOE assigned T.S-W. to a classroom where no instruction was provided, except for Dr. Tsiris' ABA activities with T.S-W.

59. T.S-W.'s classroom during September and October 2021 had two changes in teachers, the first to a substitute not certified to teach special education in New York and the second being found by DOE to not be licensed.

60. Throughout September and October 2021, T.S-W.'s DOE paraprofessionals were absent for multiple 15-to-30 minute portions of each day.

61. Even on specific request by Dr. Tsiris and her ABA technician for DOE paraprofessionals to watch T.S-W. during the setup of ABA activities, the paraprofessionals have stopped watching T.S-W. without notice, leading to elopement and injury.

62. On October 12, 2021, after Dr. Tsiris had reported in-school incidents to S.S., DOE's Assistant Principal suggested Dr. Tsiris was not wanted and asked Dr. Tsiris to have S.S. provide a letter stating that she would seek a nonpublic school placement.

63. S.S. directed the Assistant Principal to the due process complaint for Case No. 211163.

64. On October 21, 2021, after Dr. Tsiris reported incidents of a DOE paraprofessional who, on multiple occasions, shouted orders at T.S-W. and abandoned watching him, the Assistant

Principal informed Dr. Tsiris that the School would no longer allow her ABA technician on the property to assist with ABA.

65.     On October 21, 2021, S.S.'s counsel alerted DOE's counsel in 1:20-cv-9394-VSB, of a request by T.S-W.'s Assistant Principal for T.S-W. to be placed in a non-public school.

66.     NYSED issued a Compliance Assurance Plan on October 22, 2021, directing DOE's CSE to reconvene by November 19, 2021, to determine any negative impact the School's failure to provide instruction consistent with regulatory requirements had on T.S-W. and whether additional services were needed, including transmittal to NYSED with documentation of, among other things, any amended or developed IEP.

67.     NYSED's decision required submission of parental notices, any IEP (whether amended or developed), schedules of any additional recommended services, and evidence of assignment to an appropriately certified teacher for the 2021-22 school year.

68.     NYSED's decision was silent as to evaluations.

69.     On October 25, 2021, DOE sought S.S.'s consent for a social history update, Vineland, classroom observation, and educational assessment.

70.     In response to DOE's request, on October 25, 2021, S.S. provided written disagreement with DOE's prior evaluation of various assessments in 2020 and 2021, and simultaneously proposed an independent educational evaluation ("IEE") by Jeanne Dietrich, Ph.D., a licensed psychologist, at the usual and customary rate of $5,500.00.

71.     New York regulations implementing the IDEA provide school districts only two options in the face of an IEE request: (i) grant the request and fund the IEE; or (ii) initiate a due process hearing to defend its evaluation.

72.    On November 3, 2021, the DOE issued a prior written notice refusing the IEE on grounds that Dr. Denor evaluated T.S-W. in 2019.

73.    Until November 5, 2021, the DOE had not found a transportation paraprofessional, instead requiring S.S. or one of her father to travel with T.S-W.

74.    On November 8, 2021, S.S. submitted an amended due process complaint to DOE in Case No. 211163.

75.    On November 8, 2021, in the absence of an IHO to preside over Case No. 211163, S.S. included both the initial and amended due process complaints in her federal Amended Complaint, for 1:20-cv-9394-VSB-JW.

76.    The DOE initiated Case No. 221263 on November 10, 2021 (via emailing of a letter dated October 26, 2021), not to defend its evaluation but to argue that an earlier neuropsychological evaluation had been the only IEE to which S.S. would be entitled.

77.    Leading up to a November 17, 2021 reconvene of the IEP team, DOE staff discussed that the week would be T.S-W.'s last for parts of his program.

78.    As a result of the communications from DOE staff about ending portions of T.S-W.'s program, on November 15, 2021, S.S. emailed the school psychologist, with a reminder of the ongoing pendency program and acknowledgment of S.S.'s willingness to review proposed amendments for consideration, including prior to the meeting and including consideration of the nonpublic school setting previously suggested by the assistant principal.

79.    In response to S.S.'s November 15, 2021 email, the school psychologist stated in an email that all recommendations would be made at the meeting.

80.    In a separate email conversation around November 15, 2021, school staff expressed their opinions that the SRO's Decision 21-178 nullified pendency during Case No. 211163.

81. Communications from DOE staff prompted counsel discussions about correcting DOE's perceptions and reengaging DOE in good faith discussions for T.S-W.'s program.

82. On November 17, 2021, DOE's IEP team members stated that they would be moving T.S-W. to an 8:1:1 class within the same school and would put allergy and epi pen training on his IEP.

83. DOE's IEP team members also indicated that they would not consider the nonpublic school, on grounds that DOE did not have S.S.'s consent for reevaluation.

84. After the meeting on November 17, 2021, DOE's representative agreed to withdraw Case No. 221263 and enter a partial resolution agreement in Case No. 211163, for the independent neuropsychological evaluation.

85. On November 22, 2021, S.S. filed a due process complaint that was designated Case No. 221918.

86. The due process complaint in Case No. 221918, among other things: (i) requested consolidation under Case No. 211163; (ii) brought claims concerning the November 2021 IEP; (iii) updated some existing claims since the filing of the amended due process complaint in Case No. 211163; and (iv) addressed relief related to the claims therein.

87. On about December 17, 2021, IHO Cohen was appointed to both Case Nos. 211163 and 221918.

88. On December 21, 2021, IHO Cohen consolidated Case Nos. 211163 and 221918 (to move forward under Case No. 211163) and scheduled a status conference as between S.S.'s counsel and the DOE non-attorney representative who each represented the same parties in Case No. 197120.

89. Also on December 21, 2021, IHO Cohen advised that, if there did not become a full resolution, she would want S.S. to provide a combined, one-page outline of all allegations and relief requested, which IHO Cohen noted "might be helpful for the DOE in resolution as well."

90. On December 22, 2021, DOE replaced its non-attorney representative with an attorney who had over thirty years of experience in litigation.

91. DOE did not collect or provide its data for review by the evaluator until after her testing and school observation was completed.

92. DOE did not collect or provide its data for review by the evaluator until after two emails to DOE's counsels (with both Federal and administrative counsels included on each email) and subsequent request for subpoenas to issue.

93. When DOE made a submission for Dr. Dietrich's evaluation of T.S-W., DOE withheld some data until after the IEP meeting to review Dr. Dietrich's evaluation.

94. On the record at a status conference on February 3, 2022, S.S., via counsel, proposed an additional status conference for receipt of the independent neuropsychological evaluation, in the stated hope that the results would aid the possibility of settlement.

95. On February 7, 2022, DOE issued a "Promotion-in-Doubt Letter" to T.S-W.

96. Dr. Dietrich's independent neuropsychological evaluation, dated March 3, 2022, was provided to the IEP team on March 4, 2022, together with Dr. Tsiris' FBA and BIP.

97. The independent neuropsychological evaluation included a comprehensive record review, summary of histories, standardized assessment tools, classroom and home observations, analyses, diagnoses, and recommendations.

98. The independent neuropsychological evaluation detailed T.S-W.'s "many atypical behaviors including dangerous behaviors such as elopement and biting which have been mitigated via a carefully constructed BIP and ABA therapy."

99. The independent neuropsychological evaluation concluded its section on behavioral factors affecting T.S-W.'s school performance by stating:

"These symptoms have been present since the early development period and have become more fully manifested since the social demands of school and society have exceeded his limited capacities in emotional intelligence. [T.S-W.]'s symptoms cause clinically significant impairments in social, academic and family functioning. He is an extremely high maintenance child.

These disturbances cannot be explained by intellectual disability or global developmental delay. In my clinical opinion, these disturbances are at the root of his inability to function in the classroom."

100.    The independent neuropsychological evaluation described how T.S-W. presented in the

classroom, as follows:

"When I arrived in the classroom, the children were sitting at their desks which were spread apart. Dr. Tsiris was in the classroom with [T.S-W.] as well as his 1:1 aide. I asked the aide and his teacher questions about [T.S-W.] and I was told that [T.S-W.] had been in 3 different classrooms, had 3 different classroom teachers (and a substitute teacher for over a two week period) and 3 different 1:1 behavior support paraprofessionals. Mr. Scanlon was just getting to know [T.S-W.] and his 1:1 behavior support paraprofessional was still adjusting to [T.S-W.]'s learning needs.

I was also informed that [T.S-W.] lost the support of his long time behavior technician in the school setting owing to a school decision.

[T.S-W.]'s mother reported a progressive increase in [T.S-W.]'s maladaptive behaviors in the home and community coinciding with the start of in-person school 3 months earlier.

[T.S-W.] seemed disengaged and highly distracted although he was never disruptive or upsetting to the other children. The paraprofessional spent most of the time redirecting [T.S-W.] and trying to facilitate him in some way.

[T.S-W.]'s attention span was minimal in terms of attending to the objectives of the lesson. He did respond to re-direction, modeling and behavioral correction. Due to the number of human beings in the room and the significant needs of the children, there was a lot of coming and going with pull-outs for various related services and confusion as to therapists' absences.

I did not hear [T.S-W.] speak during the time I was in the classroom. He also was not entirely responsive to his name. He clearly required redirection and repetition.

[T.S-W.] was given seat work which I estimated to be at about Kindergarten level. He had to trace letters to match on the basis of color or beginning sound of words or some simple words to pictures.

I observed [T.S-W.] working with Dr. Tsiris and the schoolwork she was doing was more advanced than his classroom work. I was surprised by the disparity in the work. [T.S-W.] was more engaged with Dr. Tsiris. Therefore, I made a second appointment to see [T.S-W.] at home with 1:1 ABA."

101.     The independent neuropsychological evaluation described how T.S-W. presented with his

ABA staff at home, as follows, as follows:

"… Because [T.S-W.] is a flight risk (and totally unaware of apparent dangers), [T.S-W.]'s grandfather sits by the door of the apartment in order to protect [T.S-W.] from bolting out of the apartment. The door is secured with multiple dead bolts but [T.S-W.] is very adept in elopement due to his curiosity and lack of judgment.

[T.S-W.] was a different boy than when I evaluated and observed him in his classroom in December of 2021. In the classroom he was quiet, adverting eye gaze and difficult to engage. He barely spoke. During ABA at home, [T.S-W.] was totally verbal using 3-4 word sentences spontaneously to express himself. He was also working with pronouns with his ABA therapist which he achieved with 100% accuracy.

[T.S-W.] was following a visual schedule but he had no difficulty when there were changes to the schedule including activities that I did with him as part of the standardized neuropsychological battery.

[T.S-W.] transitioned well. He was brought to the bathroom on schedule by his home health aide but that did not interfere with his ability to re-join his lessons and work very productively.

[T.S-W.] was interested in all the materials but it was very clear that he would experience confusion when too many words were coming at him.

[T.S-W.] worked at his desk with intermittent self-stimulatory behavior. He was never non-compliant or had any behavior problem in any way in the ninety minute period that I spent with him. He demonstrated good eye contact and he followed the directions.

[T.S-W.] had no difficulty including me in the activities and he was able to switch from his ABA lessons to working with me without any difficulty. He did not need any breaks or reinforcers when we were working more than what he has during regular ABA therapy.

When I left he stood up, not only to say goodbye but spontaneously gave me a hug. It was a pleasure working with [T.S-W.] and his ABA staff."

102.    Dr. Dietrich's independent neuropsychological evaluation recommended, among other things:

    a.    a nonpublic school setting that "specializes in the education of children with Autism Spectrum Disorder";

    b.    "a homogenous grouping (bright children with severe ASD symptomatology) and a small student:teacher ratio (no greater than 6:1)";

    c.    "a structured, multisensory program with staff that has expertise in the early grade remediation of reading, math and writing learning disorder";

    d.    "total wrap-around services including behavior specialists, special educators, speech and language specialists, OTs, PTs and counselors";

    e.    25 weekly hours of ABA instruction in school, along with 15 weekly hours of ABA at home, which were recommended.

103.    At hearing in Case No. 211163, Dr. Dietrich testified that her recommendations, including the amount of ABA, could be adjusted based upon the program and services of the to-be-determined nonpublic school.

104.    DOE did not send the Parent any substantive documents for her review prior to the IEP meeting, instead sending only a meeting notice that stated DOE's purposes for holding the meeting and listed the anticipated attendees.

105.    Following the Parent's requests for the physical therapist to be invited due to the ordered nature of the service, on March 11, 2022, the DOE amended its meeting notice to include a Supervisor of Psychologists and T.'s transportation paraprofessional.

106. On March 11, 2022, DOE's staff providing the amended meeting notice stated, "As much as I would like to accommodate your request, I have confirmed that [the physical therapist] is not a required participant as PT is not a service on [T.]'s IEP."

107. The CSE convened on March 15, 2022, for DOE's stated purposes of:

    a.    "Requested review of [T.]'s [IEP] and, if appropriate, revise the [IEP]";

    b.    "Determin[ing] the impact on [T.]'s progress due to the School's failure to provide instruction during the Extended School Year (ESY) by a certified and qualified special education teacher";

    c.    "Determin[ing] the need for additional services due to the School's failure to provide instruction during ESY by a certified and qualified special education teacher";

    d.    "Review[ing] the certification of the teacher assigned to [T.] for the 2021-2022 school year";

    e.    "Review[ing] the results of the neuropsychological evaluation";

    f.    "Review[ing] the results of the [FBA] and [BIP]";

    g.    "Review[ing] all parts of [T.]'s IEP"; and

    h.    "Mak[ing] recommendations for an appropriate educational program".

108. At the March 15, 2022 IEP meeting, the CSE acknowledged that the public school was not working for T.S-W.

109. At the March 15, 2022 IEP meeting, the CSE indicated that it would "expedite" CBST deferral, with services that would remain the same, without identifying what they would stay the same as.

110. At the March 15, 2022 IEP meeting, the CSE did not discuss the neuropsychological evaluation's recommendations (apart from the class size and nonpublic school), the FBA or BIP, or any additional services that T.S-W. needed.

111. At the March 15, 2022 IEP meeting, the CSE avoided discussing ABA and PT services that had been recommended.

112. While the CSE did have T.S-W.'s physical therapist appear at the meeting, the CSE largely avoided having the related service providers discuss any of T.S-W.'s needs.

113. S.S. found the meeting to be rushed as compared to prior IEP meetings.

114. DOE pushed to release the related service providers on the stated basis that T.S-W.'s services would remain the same.

115. On March 15, 2022, S.S. requested the CBST packet.

116. DOE's school psychologist declined to provide the CBST packet, stating that such packet only meant having what DOE needed and that S.S. either already had or would have everything.

117. On March 18, 2022, S.S. initiated Case No. 225279, concerning the 2021-22 and 2022-23 school years (including the March 2022 IEP).

118. On March 23, 2022, IHO Cohen consolidated Case No. 225279 under Case No. 211163.

119. On April 20, 2022, DOE moved to dismiss Case No. 211163 as to the 2022-23 school year on ripeness grounds.

120. IHO Cohen denied DOE's motion to dismiss, due to the DOE's chosen IEP implementation dates and choice to not hold a resolution meeting to cure the alleged defects in the March 2022 IEP.

121. For Case No. 211163, DOE disclosed its intent to call 10-15 witnesses.

122.    After S.S.'s offerings to hold consecutive hearing dates and IHO Cohen's request for affidavits, DOE conveyed it might provide affidavits the day before the hearing.

123.    At the April 26, 2022 hearing, DOE decided to reduce its list "down to two witnesses".

124.    At the April 26, 2022 hearing, DOE stated that it was generally defending its 2021-22 school year program, but not PT.

125.    At the April 26, 2022 hearing, DOE stated that it did not have any disagreement with the requested cost of $2,500 for a PT evaluation.

126.    In DOE's opening statement at hearing in Case No. 211163, DOE admitted that DOE's intent concerning its March 2022 decision was:

> "the IEP team decided to allow the school-based support team to recommend schools, and depending on what school he is accepted to – applies to, accepted to, and is acceptable to both the parents and the school, would allow them to individualize the program, even though they would have to follow the recommendations of the IEP team."

127.    At hearing, DOE noted that it issued a March 2022 IEP, which, apart from the yet-to-be-identified nonpublic school, recommended essentially the same program and services in the earlier IEPs that the DOE failed in earlier hearings to defend.

128.    At hearing, DOE neither commented upon nor submitted evidence concerning its failure to appoint an IHO for five months or its retaliatory conduct against T.S-W.

129.    At hearing, DOE submitted a duplicate of a January 2022 social history update in S.S.'s exhibits, as well as "Progress Monitoring" sheets from April 2022, February 2020, and November 2019.

130.    At hearing, DOE did not submit evaluation reports or other assessment data.

131.    At hearing, DOE submitted prior written notices indicating that its CSE largely based its June 2021 IEP proposals on documents that the CSE either used or had available to itself in developing earlier IEPs with the same recommendations that denied T.S-W. a FAPE.

132.    DOE did not submit evidence or testimony of what, if any, documents identified by its CSE in prior written notices for the March 2022, November 2021, June 2021, or earlier IEPs were, if ever, provided to S.S.

133.    S.S.'s exhibits did show documents eventually received and used in hearings where the DOE was found to have denied T.S-W. a FAPE for earlier school years.

134.    T.S-W.'s then-current classroom teacher testified that the March 2022 IEP meeting was for a "private school placement".

135.    T.S-W.'s then-current classroom teacher testified, when asked about changing or continuing mandates, that to his belief, the program was under an IEP and that "the only time [he] heard the word 'pendency' [wa]s related to his physical therapy."

136.    DOE's school psychologist testified to recommending the nonpublic school placement.

137.    DOE's school psychologist testified that T.S-W.'s class ratio was entered in error and authority should have been abdicated for either CBST or an eventual nonpublic school.

138.    DOE's school psychologist could not recall the details concerning discussion of ABA at the March 2022 IEP meeting.

139.    During the April 26, 2022 and June 1, 2022 hearings, S.S. entered her evidence.

140.    S.S.'s affidavit verified and incorporated the facts contained in the due process complaints, outlined T.S-W.'s evaluative, educational, and legal histories, and testified particularly as to the March 2022 IEP meeting, as follows:

> "…the CSE team acknowledged that [T.S-W.]'s school was not appropriate for him and agreed to 'expedite' a deferral to the CBST to locate a state-approved nonpublic

school with a 6:1:1 class setting. [T.S-W.]'s physical therapist did attend the meeting, but his related services were not discussed, as the DOE staff indicated that [T.S-W.]'s related services would remain the same, without clarifying what they would remain the same as. I felt the IEP meeting was very rushed, and that the DOE rushed to dismiss the related service providers without giving opportunity for the IEP team to consider [T.S-W.]'s needs in these areas. Dr. Dietrich's neuropsychological evaluation and Dr. Tsiris's FBA and BIP were not discussed. The IEP team did not discuss the provision of ABA services or any other evidence-based methodologies for [T.S-W.]"

141.  S.S. corroborated her testimony with T.S-W.'s prior IHO decisions, most of his IEPs, recent progress reports and report cards, correspondence with DOE relating to the November 2021 and March 2022 IEP meetings and the CBST's unfruitful search, documentation related to the NYSED complaint, and T.S-W.'s most recent related service evaluations.

142.  S.S.'s supplemental affidavit addressed two schools that received communications from CBST and did not accept T.S-W.

143.  By affidavit, Dr. Tsiris testified about her observations in providing ABA to T.S-W., both in general leading up to the time period at issue and throughout the 2021-22 school year.

144.  Dr. Tsiris' affidavit provided information that she provided to the IEP team, along with her professional opinion of T.S-W.'s ABA needs, with a short listing of ABA schools that might be appropriate for T.S-W.

145.  Dr. Tsiris's supplemental affidavit addressed her observations and knowledge of DOE's behavior sheets.

146.  Dr. Dietrich testified as to T.S-W.'s neuropsychological evaluation, including what she would recommend for compensatory education and an appropriate program for T.S-W.

147.  Following IHO Cohen's inquiry and upon S.S.'s indication that July 8, 2022 would work for submission of closings, DOE requested a deadline of July 13, 2022, with which the IHO and S.S. agreed for both closings.

148.    On June 24, 2022, S.S. submitted a contingent notice to DOE that T.S-W. would be unilaterally placed at Gersh Academy, with private at-home ABA services by Dr. Tsiris, all contingent upon the continued absence of an appropriate program and placement for the 2022-2023 school year.

149.    Gersh Academy, located in West Hempstead, New York, is a school for students with autism.

150.    Upon the Parent's inquiry to Dr. Dietrich about how Gersh might fit T.S-W., Dr. Dietrich approved of Gersh as one of many potential options for T.S-W.

151.    Gersh's program does not subscribe to a single teaching style or approach to learning, but rather, takes into account that each child is unique.

152.    The teachers at Gersh identify each student's style of thinking and learning and develops a program to ensure the student's success.

153.    Whether a student is a photo-realistic, pattern, verbal, or auditory thinker, Gersh customizes a program that guides students to meet their own individual potential and personal best.

154.    The program at Gersh provides to its students therapeutic support that helps them navigate around obstacles, while giving them a way to cope with any struggles that occur on a daily basis.

155.    Gersh also offers intensive academic support for its students and prepares them for a career that aligns with their interests and abilities. The academic support provided coincides with the student's daily schedule and workload.

156.    Gersh's program also offers services to assist students with social-emotional development and vocational services and support.

157. S.S.'s June 24, 2022 notice stated that S.S. remained open to an appropriate State-approved nonpublic school and planned to withdraw the notice in favor of an appropriate program if identified by DOE or awarded as part of Case No. 211163.

158. S.S.'s contractual obligation to Gersh Academy is in the amount of $19,500.00, for T.S-W.'s Summer 2022 session tuition.

159. S.S.'s contractual obligation to Dr. Tsiris is in the amount of $109,200.00, for T.S-W.'s fifteen weekly hours of at-home ABA for a period of one year at a rate of $140.00 per hour.

160. S.S. submitted her written closing statement on July 13, 2022.

161. DOE never submitted a closing.

162. On July 30, 2022, IHO Cohen alerted the parties that the record would close on August 2, 2022.

163. On August 3, 2022, IHO Cohen issued an FOFD in Case No. 211163, finding that DOE's undefended June 10, 2021 and November 19, 2021 IEPs were inappropriate and that DOE did not implement its nonpublic school recommendation after the March 2022 IEP meeting, thus failing to offer a FAPE for the 2021-22 school year.

164. Without expressly addressing the substance of the March 2022 IEP, the FOFD acknowledged the impact of T.S-W.'s pendency services and pointed to Dr. Dietrich's recommendations.

165. The FOFD found that it would be "premature to assume that the DOE will not locate an appropriate placement" (presumably meaning by the end of the March 2022 IEP implementation period, as T.S-W. is a 12-month student whose 2022-23 school year had already begun before S.S. submitted a closing statement), adding that it would be important for the appropriate steps be taken

for finding such placement, including prior written notice of DOE's actions and an opportunity to inspect and review education records.

166. The FOFD found that five schools rejected T.S-W.'s application because the schools either did not have an appropriate program or an opening.

167. The FOFD declined to find an IDEA-based remedy for any retaliation, as pendency services only required the BCBA to be present and were provided in that strict sense.

168. The FOFD ordered, among other things:

> "…that the IEP shall be amended to provide for a non-public school program which specializes in the education of children with autism. The program shall provide a homogeneous grouping of bright children with severe ASD symptomatology and a small student to teacher ratio of no greater than 6:1. It shall include a structured, multisensory program with staff that has expertise in the early grade remediation of reading, math and writing learning disorder. It shall include total wrap around services including behavior specialists, special educators, speech and language specialists, OTs, PTs and counselors and a twelve month program. It shall include milieu treatment in order to remove barriers preventing the Student from focusing on classroom instruction and activities. It shall include 1:1 intensive instruction implementing a research-based structured program of ABA for 25 hours per week in school and 15 hours per week of ABA at home.

> …that the DOE shall provide to the Parent (i) an exact copy of the packet that it plans to send with the Student's applications; and (ii) the list of schools to which the CBST will apply.

> …that the DOE shall locate a placement that can provide the IEP program ordered above within 30 days of the date hereof. …"

**Second (the Instant) SRO Decision (Case No. 211163, Appeal No. 22-114)**

169. On August 24, 2022, via the parties' counsel, DOE advised S.S. that DOE would likely appeal IHO Cohen's FOFD in Case No. 211163.

170. On August 26, 2022, S.S. submitted a revised notice to DOE, that T.S-W. would have to change from Gersh Academy to Manhattan Children's Center ("MCC") due to problems with DOE's transportation arriving and making the trip to/from Gersh.

171. MCC was another school about which the Parent inquired to Dr. Dietrich; and MCC was one of the several that Dr. Dietrich believed could meet T.S-W.'s needs.

172. MCC provides a world-class ABA program implemented by highly trained staff including BCBAs, a small class structure that allows provisions of one-to-one instruction, a verbal behavior component, a feeding program, social skills training, self-management instruction, appropriate levels of SLT services incorporated throughout the day, OT at appropriate levels, co-treatment so that related service goals are included in classroom activities and objectives, sensory gym, inclusion opportunities with non-disabled peers, opportunities to participate in activities in the community, multidisciplinary group instruction, participation in music, parent educational support and training, and support for other family members.

173. The program that T. has participated in at MCC has been individualized to his needs and aligned to the New York State Learning Standards. The components of the curricula include:

     a. Academic (reading, math, language arts, writing);

     b. Social Skills (attention to task, cooperative play, conversation units);

     c. Verbal behavior (communication behavior, joint attention and perspective taking);

     d. Self-Management (functional daily-living skills); and

     e. Community of reinforcers an expanded community of interests (interest in age appropriate leisure activities and hobbies).

174. The program designed for T.S-W. at MCC has been individualized to address his needs, including reflection of his needs determined by the Assessment of Basic Language and Learning Skills, Revised ("ABLLS-R") inventories, designated goals, the wishes of the parents, and the future educational needs of the student.

175. The curricula at MCC include measurable outcomes, which are continuously measured throughout the instructional day.

176. At MCC, T.S-W. has been receiving instruction in a one-to-one teaching model in a classroom of seven students, with seven ABA instructors, and one lead teacher, with a supervisor assigned to the classroom as well.

177. Also at MCC, T.S-W. is receiving the related services of SLT and OT. He has received three individual thirty-minute sessions of SLT per week since he began his attendance, and one group session.

178. T.S-W. has also received two individual thirty-minute sessions of OT per week, and one group session.

179. T.S-W. also receives SLT and OT consultations during lunch times.

180. S.S.'s contractual obligation to MCC is in the amount of $140,700.00 for tuition for the period September 8, 2022 to June 29, 2023.

181. S.S.'s August 26, 2022 revised notice advised that the private at-home ABA would still be provided by Dr. Tsiris.

182. S.S.'s August 26, 2022 revised notice advised that S.S. remained open to an appropriate State-approved nonpublic school placement, including one similar to that ordered by IHO Cohen.

183. The Parent began to see progress in T. after a few weeks at MCC. Since attending MCC, T. has been noticeably happier, more talkative, and making some additional eye contact, although he is not to the point yet of having full conversations.

184. On September 12, 2022, DOE appealed from part of IHO Cohen's FOFD in Case No. 211163, on DOE's claims that the IHO could not award: (i) "a specific program and placement"; or (ii) "access into the school selection process".

185.     On September 20, 2022, S.S. filed her Verified Answer, together with a printout of the docket in 1:20-cv-9394-VSB, Memorandum of Law, and Affidavit of Service.

186.     S.S.'s Verified Answer cited to a number of exhibit and transcript pages for what facts should be admitted or denied.

187.     In requesting that the SRO dismiss DOE's appeal in its entirety, S.S.'s Verified Answer cited to the facts for how IHO Cohen did not err in ordering: (i) a specific program and educational setting; or (ii) DOE to keep S.S. informed of CBST's actions.

188.     DOE did not file a reply in its appeal from Case No. 211163.

189.     The SRO noted that the unappealed, binding portions of IHO Cohen's decision are:

  a.      An award of 350 hours of compensatory tutoring;

  b.      Funding by DOE for Dr. Dietrich's March 2022 neuropsychological evaluation;

  c.      Funding by DOE for an independent PT evaluation;

  d.      An assistive technology evaluation by DOE.

190.     The SRO noted that the remaining claims for the SRO to review were:

  a.      IEP amendments for specific recommendations from Dr. Dietrich's neuropsychological evaluation;

  b.      That DOE locate a nonpublic school capable of implementing the ordered IEP within 30 days of IHO Cohen's decision;

  c.      That DOE provide S.S. with an exact copy of the application packet and a list of schools to which DOE would apply.

### *IEP Amendments and Nonpublic School*

191.     The SRO characterized the first two issues, collectively, as "Prospective Placement", even though the IHO and SRO both acknowledged that implementation of the IEP should have begun in March 2022.

192.     The SRO relied upon DOE's March 28, 2022 prior written notice, in conflict with the witnesses and evidence on which the IHO relied, as well as the IHO's unappealed finding that "DOE failed to offer appropriate services during July and August 2021…" that the prior written notice had found to be appropriate.

193.     IHO Cohen had not found DOE's March 28, 2022 prior written notice sufficiently credible to cite even once, while citing to other evidence and testimony multiple times.

194.     The SRO's determination against amending the IEP relied upon whether certain recommendations "may have the unintended consequence of making the student even more difficult to place."

195.     The SRO's decision reminded DOE that "[i]n the event that the district cannot find an appropriate State-approved program within the State to meet the student's needs, State law expressly directs the district to notify the Commissioner of Education".

196.     There was no indication in the Record, the IHO's FOFD, nor the SRO's decision that DOE had notified the Commissioner of Education that no schools were available.

197.     The SRO's determination against amending the IEP also relied upon a stated unwillingness to review whether the March 2022 IEP was substantively appropriate.

198.     By virtue of ordering IEP amendments that could only be ordered upon finding an IEP insufficient, IHO Cohen made an implicit determination the March 2022 to have denied T.S-W. a

FAPE, after earlier stating in the FOFD that it was appropriate for her to review the March 2022 IEP.

199.     S.S.'s closing statement to the IHO and memorandum of law to the SRO each set forth the facts as to how the March 2022 IEP denied T.S-W. a FAPE.

200.     In addition to not providing a closing statement to the IHO, DOE did not provide a memorandum of law to the SRO.

201.     By making a determination against the IEP amendments based upon declining to reconstruct DOE's unstated arguments concerning the March 2022 IEP, the SRO shifted the DOE's burdens of proof from both the hearing level and SRO level onto S.S.

202.     The SRO suggested that DOE's reuse of its November 2021 IEP recommendations constituted "incorporat[ing] evaluative information and some recommendations from the March 2022 neuropsychological evaluation into the March 2022 IEP".

203.     The SRO did not address DOE's admission that DOE had kept the IEP the same except for the nonpublic school placement, for the chosen school and S.S. to negotiate what the IEP would become.

204.     The SRO did not address that DOE's nonpublic school recommendation was related to Dr. Tsiris' presence and reporting at the public school, before DOE agreed to allow reevaluation.

### *Application Packet and List of Schools*

205.     The SRO stated that neither party's argument was sufficient concerning S.S.'s entitlement to application packets submitted on her and T.S-W.'s behalf to schools because neither side "assess[ed] this information of part of a student's educational records".

206. S.S. had adopted IHO Cohen's argument on appeal, that S.S. had the right to inspect and review these as educational records, rendering the SRO's statement about sufficiency factually incorrect.

207. The SRO still found no basis to disturb the IHO's decision as to requiring DOE to provide application packets and the list of any schools where DOE would apply for T.S-W.

**Additional 2021-22 Facts and Post-Second SRO Decision**

208. Certain aspects of Spring 2022 were not addressed in Case No. 211163 due to the shift from occurrences in a disputed program to the absence of a promised State-approved nonpublic school program; more specifically, these aspects pertained to the continuation of Fall 2021 examples of DOE's in-school conduct.

209. Essentially every day at T.S-W.'s school became a new, non-educational challenge.

210. At first, from December 2021 to the beginning of February 2022, T.S-W. was unable to be in school due to a continuous wave of COVID notices; and on days that left T.S-W.'s classroom unaffected, notices were conveyed by his teacher to S.S. due to T.'s usual contact with other floors of the school for which notices were issued.

211. T. needed two people for transitioning anywhere; and frequently ran from his paraprofessional and teacher, as well as his OT, PT, SLT, and counseling providers.

212. From February 2022 through the remainder of Spring 2022, T.S-W. continued to twist out of DOE providers' hands and attempt to elope, including after Dr. Tsiris' repeated instructions and reminders for appropriately transitioning him in accordance with his BIP.

213. When in a room, T. almost always eyed the door, and any time that he managed to elope, he would run straight for the stairwell that (if he reached the bottom) would be his closest exit to the outside.

214.    For gym, staff set goal nets at the exits as a blockade, which slowed (but not stopped) him.

215.    Typically, with gym, Dr. Tsiris had to wait outside, on the other side of the door from the goal net barricade, and managed to catch T.S-W. when he got past the barricade and through the door.

216.    On various occasions, DOE's classroom staff stated or otherwise conveyed personal opinions to Dr. Tsiris that the children in T.S-W.'s class could not learn or that staff were present as babysitters.

217.    In the classroom, when T.S-W.'s teacher was unable to engage T., Dr. Tsiris instructed the teacher on T.S-W.'s need for about a week of "pairing" activities to become comfortable with a new person.

218.    T.S-W.'s teacher reported that he was on pairing activities for about a month.

219.    T.S-W.'s teacher engaged only in maintenance of T.S-W.'s then-current masteries, instead of presenting materials that would be challenging for T.S-W., who was the only student in his class who could read, multiply, write, and answer WH- questions from books.

220.    For the most part, T. engaged in other maladaptive behaviors, including aggressing toward other children, when he became bored with work that was extremely below his instructional and functioning levels, such as being asked to unscramble simple color words like "red".

221.    As T.S-W. engaged other children's behaviors with actions such as rolling on the floor, paraprofessionals encouraged the behavior by watching and laughing.

222.    At other times, T.S-W. gave into impulses such as playing with toilet water, smearing feces, throwing everyday objects down the toilet, and partly covering faucets in a manner that sprayed the entire bathroom floor, making conditions dangerous for others.

223. Even though DOE was aware of Dr. Tsiris' medical ABA for T.S-W. outside the school setting and that she was instrumental to assisting with T.S-W.'s toilet training, DOE staff would not allow her to set foot inside the bathroom at the same time as T.S-W., which resulted in several messes to the bathroom and T.S-W. himself.

224. As with Fall 2021, school staff for the rest of the school year continued to make statements and engage in conduct that had the effect of making the work environment hostile to Dr. Tsiris, which, in turn, limited her time and ability to tend to T.S-W. for his ABA services.

225. A factor in the limitation on Dr. Tsiris' time was that DOE had stopped permitting the ABA technician to join her, leaving her as essentially the only person catching T. when he eloped and blocking doors before he could exit the room or school.

226. Dr. Tsiris was unable to break for lunch, typically having to bring a granola bar.

227. On one occasion that T.S-W.'s teacher pulled Dr. Tsiris aside, he admonished that Dr. Tsiris had to stop reporting or mentioning that the class or school was not the right place for T.S-W.; and claimed to her that saying so was "denigrating" to the other children.

228. Other occasions by other staff members were more public, such as the nearby administrative assistant who—despite being told that Dr. Tsiris was there for T.S-W. and would need to make copies at the machine down the hall from his classroom—made a point to walk her back to the classroom and announce to the room to have DOE staff walk with her whenever she went to make copies.

229. After the SRO's decision No. 22-114, S.S. did not hear from DOE concerning T.S-W.'s IEP or placement until MCC informed S.S., on November 17, 2022, that DOE had informed the school that an IEP meeting would be held for T.S-W. on December 7, 2022.

230.　On November 18, 2022, DOE revised its meeting time in a notice to S.S., that the IEP meeting would be held on January 9, 2023.

231.　On November 30, 2022, DOE informed S.S. that it scheduled a psychoeducational evaluation for T.S-W., directed him to appear on December 20, 2022, with S.S.'s provision of various reports, work samples, assessments, and other educational records.

232.　On December 20, 2022, a non-attorney DOE hearing representative called S.S. on the stated purpose of eliciting information for a "Social History Update".

233.　DOE's hearing representative stated to S.S. that, while he typically represents DOE at due process hearings, he was not calling for that purpose.

234.　DOE issued a "Social History Update" report, dated December 20, 2022, to S.S. on January 9, 2023, hours after the IEP meeting.

235.　On December 20, 2022, a DOE evaluator conducted an academic achievement assessment on T.S-W., without other assessment.

236.　The DOE evaluator's December 20, 2022 evaluation was conducted at the end of the day after T.S-W.'s medication was at a low point in effectiveness.

237.　The DOE evaluator demonstrated throughout and after the December 20, 2022 evaluation that she was not familiar with T.S-W.'s more typical and problematic behaviors such as elopement and distractibility, at the time of the December 20, 2022 evaluation.

238.　The DOE evaluator was not consistent in either accommodating or otherwise correcting for any of T.S-W.'s symptomatic behaviors, such as distractibility or self-direction.

239.　The DOE evaluator appeared nervous or scared, including by turning her body away from T.S-W. and reading through questions quickly without looking for whether T.S-W. was paying attention or otherwise engaged.

240. The DOE evaluator acknowledged at the evaluation on December 20, 2022, that she should have assessed T.S-W. in the morning instead of the early evening.

241. On December 23, 2022, the DOE evaluator issued a report concerning the assessment, with such report relying upon the March 2022 IEP to state what, except for placement, had last been "recommended".

242. The DOE evaluator's December 23, 2022 report included a summary of some of the standardized assessment results from Dr. Dietrich's evaluation.

243. The DOE evaluator's December 23, 2022 report included a list of T.S-W.'s diagnoses from Dr. Dietrich's evaluation.

244. In her December 23, 2022 report, the DOE evaluator noted T.S-W.'s activeness, high distractibility, self-direction, impulsivity, and need for prompting and redirection.

245. The DOE evaluator's December 23, 2022 report stated that the "results of the evaluation may be an underestimate of [T.S-W.'s] abilities."

246. The DOE evaluator's December 23, 2022 report did not make any recommendations, instead stating that the report's purpose was "to provide information to assist the [IEP] team in making that decision" about special education eligibility and services.

247. DOE sent the education evaluation report to S.S., without any other reports, data, or information—whether in the same or a separate communication—prior to the January 9, 2023 IEP meeting.

248. T.S-W.'s classroom team at MCC developed a combined FBA and BIP, with a report issued on January 6, 2023.

249. MCC's FBA and BIP identified and targeted behaviors of aggression, elopement, screaming, self-injury, and refusal.

250.    MCC's FBA and BIP included a plan for crisis management, home-school coordination/communication, reliability checks on observers, and eventual discontinuation.

251.    On January 6, 2023, MCC sent its FBA and BIP, along with T.S-W.'s goals at the school, to DOE for T.S-W.'s IEP meeting.

252.    On January 9, 2023, DOE again rushed S.S. through a telephonic IEP meeting that was meant for T.S-W.

253.    Over the course of only about 22 minutes, DOE's team representative primarily read through DOE's proposed 41-page IEP.

254.    DOE's team representative spoke very quickly throughout the phone call, such that S.S. could not get her thoughts or questions into the call for several topics.

255.    DOE's team representative spoke over the others present at the meeting, including in a condescending and dismissive tone toward S.S.

256.    On topics where S.S. managed to get a word into the call, DOE's team representative dismissed each request.

257.    When S.S. managed to make an inquiry about DOE's OT recommendation, DOE's team representative conveyed a lack of knowledge about what "push-in" and "pull out" related services were.

258.    DOE's team representative indicated that the IEP recommendations were not based upon any reasonable calculation of T.S-W.'s needs, including by stating that the recommendations were being made for what some unidentified nonpublic schools would accept.

259.    At the January 9, 2023 IEP meeting, DOE's team representative stated that a new school was already selected for T.S-W., which would be conveyed to S.S. "next week".

260.    DOE's team representative indicated that CBST was not searching for schools, by stating that T.S-W.'s case would be deferred to CBST.

261.    DOE's team representative stated that not being State-approved made the suggestion of MCC "not appropriate".

262.    MCC has been found appropriate for some children with Autism who need ABA.

263.    Gersh Academy has also been found appropriate for some children with Autism who may need ABA or a similar research-based methodology for children with Autism.

264.    DOE's team representative spontaneously communicated with a DOE attorney during the IEP meeting, without prior notice to S.S. and without identification on the IEP's list of participants.

265.    DOE's team representative incorrectly asserted at the IEP meeting that there was no at-home ABA in the IHO's decision.

266.    DOE's team representative sent DOE's January 9, 2023 IEP to S.S. in less than an hour after the meeting.

267.    The January 9, 2023 IEP's "Present Levels of Performance and Individual Needs" did not reflect T.S-W.'s present levels of performance or individual needs, including in that the section of the IEP included statements or opinions by DOE that were rejected at hearing and not appealed.

268.    The January 9, 2023 IEP's "Present Levels of Performance and Individual Needs" did not reflect T.S-W.'s present levels of performance or individual needs, including in that speculation or other conjecture was inserted in various areas in manners that were directly contrary to T.S-W.'s evaluations and unappealed due process findings.

269.    Conjecture within the "Present Levels of Performance and Individual Needs" section of the January 9, 2023 IEP was inserted between paragraphs pulled from a single source, in a manner that made the conjecture incorrectly appear to have also been from that source.

270. The "Management Needs" subsection of the "Present Levels of Performance and Individual Needs" section of the January 9, 2023 IEP stated incomplete orders and recommendations for T.S-W.'s services that were neither carried over to the mandates of the IEP nor provided explanation for why such orders and recommendations were not being mandated, such as:

    a.    Dr. Tsiris's designation and rate as the BCBA, for any pendency, was omitted by DOE but remained in effect for S.D.N.Y. 1:20-cv-9394-VSB-JW, were S.S. able to return T.S-W. to a school.

    b.    Any mention of ABA was omitted from DOE's iteration of Dr. Dietrich's recommendations.

271. Several of the January 9, 2023 IEP's goals were far below T.S-W.'s abilities.

272. The January 9, 2023 IEP stated that an unidentified District 75 public school would be an interim placement, without any indication of approval by the Commissioner of Education.

273. The January 9, 2023 IEP made repeated references to DOE's opinions and recommendations as being those of "the team", in a manner ignoring that S.S. is a mandatory member of the IEP team.

274. On January 10, 2023, S.S. submitted a letter of disagreement with DOE's educational evaluation and social history update to DOE's CSE, with a request for an independent psychoeducational evaluation.

## FIRST CAUSE OF ACTION

275. S.S. repeats and re-alleges all above paragraphs as if fully set forth herein.

276. The SRO missed or misstated several facts that were cited by S.S. and/or IHO Cohen and not countered by DOE.

277.     The SRO's decision includes speculative bases against allowing the IHO's ordered IEP amendments.

278.     The SRO expressly declined review of the substantive adequacy of the March 2022 IEP.

279.     The SRO's observations on procedural development of the March 2022 IEP are incorrect on the face of the Record and DOE's admissions at hearing.

280.     The SRO's bases and directives conflict with one another, without reconciliation.

281.     The SRO's observations and conclusions do not require use of educational expertise.

282.     The SRO gave undue deference to documents created by DOE after the IEP meeting, which were inconsistent with the other evidence and testimony and which the IHO rejected.

283.     The SRO's decision is not well-reasoned.

284.     Neither of the parties addressed the contingent notices of unilateral placement to either the IHO or the SRO, making such fact one of first impression to the litigation of Case No. 211163.

285.     The SRO's decision is not entitled to deference.

286.     The Court should defer to the IHO's analysis for Case No. 211163.

287.     The SRO erred in framing IEP amendments for a pre-existing IEP as "prospective placement".

288.     The SRO erred in framing the nonpublic school order in relief for an ongoing IEP implementation failure as "prospective placement".

289.     The SRO erred in relying on DOE's prior written notice as its basis for what occurred

290.     The SRO erred in reversing the ordered IEP amendments on grounds that the amendments might make the student more difficult to place, instead of any connection to the student's needs.

291.     The SRO erred in not finding the March 2022 IEP substantively inadequate, as indicated by the IHO, S.S.'s uncontroverted closing statement, and S.S.'s responsive papers before the SRO.

292.     The SRO erred in framing the predetermined nonpublic school placement as the parties having "achieved some common ground".

293.     The SRO erred in mistaking DOE's repetition of the November 2021 IEP mandates into the March 2022 IEP as "incorporat[ing]" parts of the March 2022 neuropsychological evaluation.

294.     Under the circumstances, the SRO erred in directing yet another CSE reconvene.

295.     The SRO erred in sustaining DOE's appeal.

296.     The SRO erred in reversing portions of the IHO's August 3, 2022 FOFD.

297.     A valid case or controversy exists between the parties.

298.     T.S-W.'s injury-in-fact from all of the above is that he has had nowhere else to go than a non-State-approved nonpublic school with private at-home ABA, during DOE's apparently-ceased search for a State-approved nonpublic school.

299.     S.S.'s injury-in-fact from all of the above is her obligation to pay T.S-W.'s tuition for his time at Gersh Academy and MCC, together with payment for private at-home ABA, all of which must be subject to an administrative *Burlington/Carter* hearing.

300.     In accordance with her duty to exhaust administrative remedies regarding tuition at Gersh Academy and MCC and the private at-home ABA payments, S.S. will be/is seeking recovery of such amounts for T.S-W. in a *Burlington/Carter* administrative due process hearing that may be ongoing or awaiting appointment of an IHO when this Court issues a decision.

301.     A declaration by this Court on the denial of FAPE to T.S-W. for his 2022-2023 school year and that equity favors S.S.'s placement decision would lessen the resources necessary for an IHO to make the same determination on the same facts set forth above.

302.     S.S. requests this Court:

         a.       Annul the October 12, 2022 decision 22-114 of the SRO;

b.      Find that IHO Cohen was within her authority to fashion the relief that she ordered under the circumstances and following a full, thorough hearing on the merits for which DOE declined to submit any closing statement;

c.      Affirm IHO Cohen's August 3, 2022 FOFD, with an Order for DOE to identify, locate, and secure a State-approved nonpublic school consistent with the IEP ordered by IHO Cohen, within 30 days of this Court's Order;

d.      Declare that DOE denied T.S-W. a FAPE for the 2022-2023 school year; and

e.      Declare that the equities balance in favor of awarding S.S. funding for T.S-W.'s tuition for his respective times at Gersh Academy and MCC, as well funding for T.S-W.'s private at-home ABA services.

## SECOND CAUSE OF ACTION

303.    S.S. repeats and re-alleges all above paragraphs as if fully set forth herein.

304.    Title II of the Americans with Disabilities Act of 1990 ("ADA") and its implementing regulations prohibit public entities, including local educational agencies, from excluding or denying people with disabilities the benefits of their services, programs, or activities or to discriminate on the basis of disability. 42 U.S.C. § 12132; 28 C.F.R. §§ 35.104 & 130(a).

305.    Prohibited disability-based discrimination by public entities includes the failure to provide qualified individuals with disabilities an equal opportunity to participate in or benefit from aids, benefits, or services or "otherwise limit" a qualified individual with a disability in the enjoyment of any right, privilege, aid, benefit, or service. 28 C.F.R. § 35.130.

306.    T.S-W. is an individual with physical and cognitive impairments.

307.    T.S-W. impairments affect major life activities, including toileting and safety habits. 42 U.S.C. § 12102(2)(A).

308. T.S-W. is an individual with a disability as defined by 42 U.S.C. § 12102.

309. T.S-W. is also a child with a disability as defined by 20 U.S.C. § 1401.

310. T.S-W. is also an otherwise qualified individual with a disability who meets essential eligibility requirements to receive services from or participate in DOE's programs or activities. *See* 42 U.S.C. § 12131(2).

311. DOE is a public entity under the ADA, a local educational agency, and part of New York State's system of free common schools, wherein all the children of the State are entitled to be educated. *See* N.Y. Const. Art. 11 § 1.

312. "A person over five and under twenty-one years of age who has not received a high school diploma is entitled to attend public schools maintained in the district in which such person resides without the payment of tuition." N.Y. Educ. L. § 3202(1).

313. DOE is a recipient and beneficiary of Federal IDEA-based funding as a local educational agency under the IDEA.

314. DOE's eligibility for financial assistance under the IDEA is predicated upon its assurances to the New York State Education Department that DOE meets each of a number of conditions, including, among other things, that DOE, "in providing for the education of children with disabilities within its jurisdiction, has in effect policies, procedures, and programs that are consistent with the State policies and procedures established under [20 U.S.C. §] 1412". 20 U.S.C. § 1413.

315. DOE's policies, procedures, and programs must be consistent with New York's policies and procedures to ensure:

> "To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only

when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."

20 U.S.C. § 1412(a)(5).

316.    DOE's funding is prohibited from resulting "in placements that violate the requirements"

quoted above. 20 U.S.C. § 1412(a)(5)(B), *citing* § 1412(a)(5)(A).

317.    DOE's funding distribution is prohibited from resulting in a type of setting where T.S-W.

is served "that will result in the failure to provide a child with a disability a free appropriate public

education according to the unique needs of the child as described in the child's IEP." 20 U.S.C.

§ 1412(a)(5)(B).

318.    At nine years old, T.S-W. is within the age range for students entitled to attend, without

the payment of tuition, public schools maintained in the district in which he resides. N.Y. Educ. L.

§ 3202(1).

319.    T.S-W. has not received a high school diploma. N.Y. Educ. L. § 3202(1).

320.    DOE is the local educational agency with schools in the district where T.S-W. resides. N.Y.

Educ. L. § 3202(1).

321.    T.S-W. is entitled to attend DOE schools for free and without payment of tuition. N.Y.

Const. Art. 11 § 1; N.Y. Educ. L. § 3202(1).

322.    T.S-W. and S.S. are entitled to the benefit of DOE's obligation under 20 U.S.C. §§ 1412,

1413 to afford children with disabilities and their parents the procedural safeguards required by 20

U.S.C. § 1415 and consistent with New York State's policies and procedures implementing such

safeguards, including but not limited to opportunity for S.S. "to examine all records relating to

[T.S-W.] and to participate in meetings with respect to [his] identification, evaluation, and

educational placement", resolution meetings, and, when necessary, impartial due process hearings with disclosures "[n]ot less than 5 business days prior to a hearing".

323.    DOE regularly represents to the U.S. District Court for the Southern District of New York that the multitudes of cases for which families seek "prevailing party" fees under the IDEA are regularly "undisputed", "uncontested", "straightforward", "not complex", "workaday work in a workaday world", without the need for parties to be represented by attorneys.

324.    The ADA imposes a duty on DOE not to engage in retaliation or coercion against S.S. or T.S-W. Specifically, 42 U.S.C. § 12203 provides:

> a.    "Retaliation. No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act.

> b.    Interference, coercion, or intimidation. It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or an account of his or her having aided or encouraged any other individual in the exercise or enjoyment, of any right granted or protected by this Act."

325.    It was a protected activity for S.S. and Dr. Tsiris to pursue T.S-W.'s access to the benefits of DOE's services, programs, and activities, including the equal opportunity to participate in, benefit from, or otherwise enjoy the aids, benefits, services, rights, or privileges of the same.

326.    Pursuit of T.S-W.'s rights under the IDEA and pursuit of his general safety in school were each protected activities, including when S.S. or Dr. Tsiris pursued these rights on T.S-W.'s behalf.

327.    Pursuit of S.S.'s rights under the IDEA was a protected activity, including instances where Dr. Tsiris assisted or participated in any investigation into the exclusion, denial, or other limitation of S.S.'s or T.S-W.'s entitlements to the services, programs, activities, IDEA procedural safeguards, or other enjoyment of rights, privileges, aids, benefits, or services afforded by DOE as a public agency.

328.    By the acts and omissions of DOE and its employees, DOE violated the foregoing provisions of the ADA by retaliating against S.S. and T.S-W. by engaging in prohibited interference, coercion, and/or intimidation, including for protected activities taken on T.S-W.'s behalf.

*DOE's Removal of ABA Technician*

329.    Following Dr. Tsiris' reporting of DOE's child endangerment and IDEA noncompliance on T.S-W.'s behalf, DOE took adverse action against T.S-W. by demanding that Dr. Tsiris no longer bring T.S-W.'s ABA technician who had assisted in providing services and otherwise protecting T.S-W. at school.

330.    DOE's demand against T.S-W.'s ABA technician was of a design, temporal proximity, and manner that would be reasonably likely to deter S.S. and those acting on T.S-W.'s behalf from engaging in reporting and otherwise pursuing T.S-W.'s and S.S.'s rights under the IDEA and to general safety in school.

331.    DOE's demand against T.S-W.'s ABA technician (who had been with Dr. Tsiris at the school without complaint since before the reporting) would not have been made but for Dr. Tsiris' reporting on T.S-W.'s behalf nor but for other pursuit of T.S-W.'s and S.S.'s rights under the IDEA and to general safety in school.

332.    As the direct and proximate result of violating the ADA, DOE caused S.S. and T.S-W. to suffer injuries and losses, including scratches, falls, loss of T.S-W.'s ABA technician, and loss of rights guaranteed by the ADA.

333.    As the ABA technician had been permitted into the classroom in daily assistance of T.S-W.'s ABA services for over a month and as DOE had had the Stipulation and Order concerning pendency for over two months (that is, including before the ABA technician first arrived), DOE's reliance on the absence of the ABA technician from the pendency arrangement was a pretext for retaliatory motive.

334.    As the entity held accountable for violations of the ADA, DOE is liable for all injuries and losses thereunder.

335.    S.S. exhausted her administrative remedies, by including the claim in the unappealed portion of Case No. 211163, for IHO Cohen to determine whether any IDEA remedy existed.

336.    IHO Cohen determined that the technician was not part of the pendency arrangement, which would have been necessary for IDEA relief but not ADA relief.

337.    A finding of pretext that makes ADA relief available is not part of IDEA analysis into what compensatory services a student might need to make up for deprivation of a FAPE.

338.    IHO Cohen determined that the BCBA remained available and provided ABA services under the pendency arrangement.

339.    From the perspective of the IDEA, IHO Cohen found that requesting "to remove an extraneous person, such as the technician, was not unreasonable", resulting in no IDEA-based remedy.

340.    DOE did not appeal IHO Cohen's determinations on the retaliation claim, making it binding that no IDEA-based remedy would have given T.S-W. or S.S. relief from this injury.

341.   Even without an IDEA-based remedy, the Record below reflects that T.S-W. was physically scratched and injured when DOE staff ignored T.S-W. and did not heed his ABA staff's requests to watch him while they transitioned between educational activities.

342.   The Record below reflects that T.S-W.'s ABA technician protected T.S-W. from elopement and other child-endangering behaviors while the BCBA was conducting observations for the FBA or transitioning between activities.

*Engagement in Tactics Creating Hostile Environment without Other Choice Than Non-State-Approved Nonpublic School*

343.   Also following Dr. Tsiris' reporting of DOE's child endangerment and IDEA noncompliance on T.S-W.'s behalf, DOE took adverse action against T.S-W. and S.S. by engaging in tactics in a manner that created a hostile environment and no other place for T.S-W. to go than a non-State-approved nonpublic school at S.S.'s own financial risk.

344.   <u>In addition to</u> removal of T.S-W.'s ABA technician, DOE's tactics contributing to the hostile environment, inability for T.S-W. to go elsewhere, and, ultimately, the adverse action included but were not necessarily limited to the following "enumerated tactics":

     a.     the Assistant Principal asking S.S. to submit a letter asking to have T.S-W. removed to a nonpublic school (even though a nonpublic school placement was already requested due process relief);

     b.     refusing to enter into a partial resolution agreement as to the nonpublic school (even though the Assistant Principal had asked S.S. to submit a letter asking to remove T.S-W. to a nonpublic school);

     c.     initiating an unfounded due process complaint against S.S. that, upon alert between counsel, was withdrawn in favor of a partial resolution agreement for S.S.'s requested independent neuropsychological evaluation;

d.      harassing S.S. both directly and via comments to Dr. Tsiris, in days leading up to the November 2021 IEP meeting, stating that DOE would (incorrectly) construe pendency nullified and change or discontinue certain parts of T.S-W.'s program;

e.      withholding information and data from the independent evaluator;

f.      withholding agreement on the PT evaluation and its cost that DOE did not state until after opening statements (and after multiple pre-hearing conferences) were undisputed points;

g.      rushing S.S. through the March 2022 IEP meeting, toward changing only placement, for removal of T.S-W. to a yet-identified State-approved nonpublic school, leaving S.S. to negotiate a new IEP with whatever school DOE would find to accept T.S-W. (and acknowledging, by that programmatic change, that staying at the school was no longer appropriate for T.S-W.);

h.      showing deliberate indifference toward T.S-W.'s dangerous and reaction-eliciting behaviors;

i.       overworking and otherwise treating Dr. Tsiris in a demeaning, condescending, and vexing manner;

j.       withholding the application packet of which of T.S-W.'s educational records were being provided or excluded from the nonpublic schools' consideration of T.S-W.;

k.      refusing to keep S.S. apprised of the full list of schools to which DOE would apply on her and T.S-W.'s behalf;

l.       amplifying that DOE would call fifteen witnesses and potentially wait until the day before hearing to provide affidavits (which DOE did not provide), before declaring for the

first time at its day of hearing that DOE ultimately decided to call only two of its identified witnesses;

m.      demanding a subsequent hearing date for cross-examination that DOE ultimately did not use for the evidence it had at the time of the demand;

n.      seeking an extended closing brief deadline without subsequently submitting any closing;

o.      failing to communicate to the IHO that DOE was not submitting a closing, even after the IHO's inquiry;

p.      failing to communicate with the Commissioner of Education concerning any difficulties by DOE in identifying a State-approved nonpublic school for T.S-W.

345.    Each and every of DOE's above engagements were of a design, temporal proximity, and manner that would be reasonably likely to deter S.S. and those acting on T.S-W.'s behalf from engaging in reporting and otherwise pursuing T.S-W.'s and S.S.'s rights under the IDEA and to general safety in school.

346.    DOE's above engagements would not have been made but for Dr. Tsiris' reporting on T.S-W.'s behalf nor but for other pursuit of T.S-W.'s and S.S.'s rights under the IDEA and to general safety in school.

347.    As the direct and proximate result of violating the ADA, DOE caused S.S. and T.S-W. to suffer injuries and losses, including scratches, falls, stress from harassment, loss of T.S-W.'s ABA technician, contractual obligations to Gersh Academy, MCC, and Dr. Tsiris, and loss of rights guaranteed by the ADA.

348.    DOE did not dispute the retaliation claim at hearing or before the SRO.

349.     The IHO found the only IDEA-related aspect of the retaliation claim for her review was the impact of losing the ABA technician on T.S-W.'s services, which had not created a loss of ABA time warranting IDEA-related relief.

350.     DOE did not appeal the IHO's determination to SRO to find any other aspect of the retaliation claim resolvable by virtue of IDEA relief.

351.      DOE does not have any legitimate, nonretaliatory, nonpretextual reason(s) for engaging in the enumerated tactics.

352.     As the entity held accountable for violations of the ADA, DOE is liable for all injuries and losses incurred due to DOE's and its employees' and agents' engagements in the enumerated tactics.

353.     S.S. exhausted her administrative remedies, by including the claim in the unappealed portion of Case No. 211163, for IHO Cohen to determine whether any IDEA remedy existed.

*Constructive Expulsion*

354.     DOE's engagement in the enumerated tactics creating a hostile environment without other option for T.S-W., <u>collectively,</u> create an adverse action that is independent, separate, and distinct from DOE's underlying, contributing engagements in any individual tactic or subgroup of tactics.

355.     The combination of provisions in "New York's Constitution and New York's education laws establish[] a property interest in education protected by the Fourteenth Amendment" of the U.S. Constitution. *Smith v. Guilford Bd. of Educ.*, 226 F.Appx. 58, 62 (2d Cir. 2007) (Summary Order), *citing Handberry v. Thompson*, 436 F.3d 52, 70-71 (2d Cir. 2006).

356.     T.S-W. has a legitimate claim of entitlement to a property interest in a free appropriate public education.

357. DOE's adverse action in engaging in the enumerated tactics, collectively, had the risk and effect of depriving T.S-W. of any school in which to access a free appropriate public education, requiring S.S. to negotiate with Dr. Tsiris and seek out schools that would allow forbearance for contracted tuition, all on a *Burlington/Carter/Connor*'s basis while she pursues relief at her own financial risk.

358. DOE's adverse action in engaging in the enumerated tactics, collectively, amounted to T.S-W.'s constructive expulsion from DOE schools, which is not cured by the January 9, 2023 IEP, which did not result in an actual placement recommendation and which came long after unilateral placement became required.

359. DOE's movement toward constructive expulsion was of a design, temporal proximity, and manner that would be reasonably likely to deter S.S. and those acting on T.S-W.'s behalf from engaging in reporting and otherwise pursuing T.S-W.'s and S.S.'s rights under the IDEA and to general safety in school.

360. DOE's movement toward constructive expulsion would not have been made but for Dr. Tsiris' reporting on T.S-W.'s behalf nor but for other pursuit of T.S-W.'s and S.S.'s rights under the IDEA and to general safety in school.

361. As the direct and proximate result of DOE's adverse action of movements toward constructive expulsion, DOE ultimately effectuated T.S-W.'s exclusion or denial of DOE's services, programs, or activities—an independent violation of Title II of the ADA. That is, this violation by DOE of Title V (retaliation) against the protection of Title II (public services) rights was itself an act by DOE to violate Title II.

362. As the direct and proximate result of violating the ADA, DOE caused S.S. and T.S-W. to suffer injuries and losses, including loss of access to a free appropriate public education and the

addition of a financial burden, albeit with forbearance until the completion of a *Burlington/Carter/Conner*'s hearing, of fronting the costs of T.S-W.'s education at Gersh Academy and MCC and with Dr. Tsiris, as well as suffered losses of rights guaranteed by the ADA.

363.　To the extent that DOE's ultimate constructive expulsion could be addressed by IDEA relief of IEP amendments and/or an FOFD directing placement in a State-approved nonpublic school, DOE's repeated tactics (*i.e.,* in dragging S.S.'s and T.S-W.'s hearings and the implementation thereof into new school years), together with the SRO's repeated choice (*i.e.,* to find relief on new school years—including those which have already begun with carry-over IEPs from the prior school year—to be "premature"), demonstrate that further attempts to seek appropriate IEP amendments and/or State-approved nonpublic school placement would be futile or otherwise continue to evade review.

364.　DOE's movement toward constructive expulsion is a continuing, collective series of conduct, which unfolded from claimed, contributing adverse actions during the course of the same administrative proceedings that became part and parcel of and otherwise subsumed within the original, administratively-exhausted claim from below.

365.　To the extent, if any, that the Court determines that certain results of DOE's constructive expulsion (*i.e.,* S.S.'s contractual obligations to Gersh Academy, MCC, and Dr. Tsiris) require any further administrative exhaustion, S.S. has filed a due process complaint for such hearing (with a case number currently pending) and plans to keep the Court apprised of whether and what progress is made in that forum.

366.　DOE did not dispute the underlying acts of retaliation claim at hearing or before the SRO.

367.    The IHO found the only IDEA-related aspect of the retaliation claim for her review was the impact of losing the ABA technician on T.S-W.'s services, which had not created a loss of ABA time warranting IDEA-related relief.

368.    DOE did not appeal the IHO's determination to SRO to find any other aspect of the retaliation claim resolvable by virtue of IDEA relief.

369.    DOE does not have any legitimate, nonretaliatory, nonpretextual reason(s) for its movement toward constructive expulsion.

370.    As the entity held accountable for violations of the ADA, DOE is liable for all injuries and losses incurred due to DOE's and its employees' and agents' engagements in the enumerated tactics.

*Relief on Second Cause of Action*

371.    The above instances of retaliation against S.S. and T.S-W., in violation of the ADA, were conducted with deliberate indifference by DOE officials with the authority to address and correct the

372.    This Court should award monetary damages under the ADA and Section 1983, including for:

    a.    S.S.'s contractual, forborne obligation to MCC;

    b.    S.S.'s contractual, forborne obligation to Gersh Academy;

    c.    S.S.'s contractual, forborne obligation to Dr. Tsiris;

    d.    Constraints upon T.S-W.'s access, use, and enjoyment of the benefits, programs, and services to which he is entitled.

    e.    Scratches, falls, and other physical injury to T.S-W.

373. To the extent, if any, that both the Court determines some but not all administrative exhaustion remains necessary and the *Burlington/Carter/Connor*'s hearing has not begun or is otherwise not completed, this Court should declare:

a. DOE's violation of the ADA includes that DOE has denied T.S-W. the benefits of, or an equal opportunity to participate in or benefit from, the FAPE that DOE must provide all children between the ages of five and twenty-one years of age who have not received a high school diploma. N.Y. Educ. L. § 3202(1); N.Y. Const. Art. 11 § 1.

b. At the time it was made, S.S.'s contingent decision to place T.S-W. at Gersh Academy, with private at-home ABA by Dr. Tsiris, was reasonably calculated to provide T.S-W. the FAPE to which he is entitled under N.Y. Educ. L. § 3202(1) and N.Y. Const. Art. 11 § 1, as well as to meet S.S.'s own obligations toward New York's compulsory education (N.Y. Educ. L. §§ 3201 *et seq.*) and, if deemed necessary, to mitigate the losses suffered by T.S-W. and S.S. by DOE's violations of the ADA.

c. At the time it was made, S.S.'s contingent decision to place T.S-W. at MCC, with private at-home ABA by Dr. Tsiris, was reasonably calculated to provide T.S-W. the FAPE to which he is entitled under N.Y. Educ. L. § 3202(1) and N.Y. Const. Art. 11 § 1, as well as to meet S.S.'s own obligations toward New York's compulsory education (N.Y. Educ. L. §§ 3201 *et seq.*) and, if deemed necessary, to mitigate the losses suffered by T.S-W. and S.S. by DOE's violations of the ADA.

d. Any issues of equity, if applicable, weigh in favor of directing payment by DOE toward S.S.'s contractual obligations to Gersh Academy, MCC, and Dr. Tsiris.

### **THIRD CAUSE OF ACTION**

374. S.S. repeats and re-alleges all above paragraphs as if fully set forth herein.

375.     While the Second Circuit is on the side of a split that has judicial enforcement arising from the IDEA available through 42 U.S.C. § 1983, as opposed to those (First, Third, Fourth, Ninth, Tenth) Circuits that have held 20 U.S.C. § 1415(b)(6) is part of a comprehensive enforcement scheme that Congress intended to preclude the availability of § 1983 claims for IDEA violations, it is only important that S.S. plead both as alternatives, which she does, in case the Supreme Court resolves the split.

376.     To the extent that a *Monell* standard, if any, applies for a Court to award relief for any IDEA violations alleged herein:

   a.     DOE's actions have been rooted in what formal municipal policies allow or do not allow DOE to do, including but not limited to policies limiting, precluding, or prohibiting ABA or other research-based methodology recommendations by DOE members of IEP teams, as well as the means and manner in which CBST initiates, conducts, and ceases searches for State-approved nonpublic schools.

   b.     DOE's failures to timely or comprehensively evaluate students, timely disclose evaluative information to families, use IEP meeting time to meaningfully collaborate over IEP mandates (as opposed to treating pre-meeting IEPs as final DOE recommendations or mandates), and/or develop goals tailored to each student's needs, are so persistent and widespread and successfully argued in due process proceedings that the underlying practices' are customs or usages of which policy-making officials have constructive, if not actual, knowledge.

   c.     DOE's official policy-makers have so failed to properly train or supervise subordinates that repeated failures of the types and kinds discussed herein are regularly points of success in due process proceedings, causing the failures to properly train or

supervise to rise to the level of deliberate indifference toward the children with disabilities and their parents with whom DOE employees will come into contact.

377. The fundamental aspects of T.S-W.'s needs have been evaluated, decided, unappealed, and, at times, undisputed or agreed-upon, such that the administrative process has been demonstrably sterilized as to the gravamen of S.S.'s and T.S-W.'s disputes with DOE as to the 2022-2023 school year.

378. DOE has rendered future use of the administrative process very costly and time-consuming for S.S. and T.S-W. to pursue relief that, for the 2022-2023 school year alone, exceeds more than five times their annual household income.

379. DOE's systemic failures and illegal policies, practices, and procedures, which have directly resulted in the absence of any identified and secured State-approved nonpublic school placement for T.S-W., render the operative issues essentially legal and some or all issues relying on educational expertise academic.

380. The IDEA includes a judicial remedy for violations of any right "relating to the identification, evaluation, or educational placement of [a] child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6).

381. DOE denied T.S-W. a FAPE for the 2022-2023 school year, including by:

    a.    Failing to comprehensively evaluate T.S-W. in all areas of suspected disability;

    b.    Failing to provide S.S. with evaluative data or similar information prior to IEP meetings;

    c.    Failure to have a complete IEP and placement for the start of the 2022-2023 school year's 2022 Summer session;

d.      Predetermining or otherwise excluding S.S. and other IEP team members from providing meaningful input;

e.      Representing incorrect information as T.S-W.'s present levels of performance or individual needs on his IEP, with gross misjudgment, gross negligence, and deliberate indifference by DOE's designated team representative;

f.      Omitting from the IEP any recommendation for research-based methodology appropriate for students with similar disabilities and needs to T.S-W.;

g.      Failure to reasonably calculate T.S-W.'s goals toward meaningful, measurable progress in light of his circumstances;

382.    At the time her decision was made, Gersh Academy was an appropriate placement choice for S.S. to make, which only ceased due to DOE's transportation failures;

383.    At the time her decision was made, MCC was an appropriate placement choice for S.S. to make;

384.    At the time her decision was made, contracting with Dr. Tsiris to provide the at-home portion of T.S-W.'s program was an appropriate choice for S.S. to make;

385.    The equities favor payment to S.S. of the contractual tuition and other obligations to Gersh Academy, MCC, and Dr. Tsiris.

386.    This Court should award to S.S., as prospective payments to the respective contractual payees, the costs of T.S-W.'s attendance at Gersh Academy and MCC, as well T.S-W.'s services from Dr. Tsiris.

## **FOURTH CAUSE OF ACTION**

387.    S.S. repeats and re-alleges all above paragraphs as if fully set forth herein.

388.　　S.S. initiated a due process hearing in Case No. 211163 where she was awarded relief that DOE did not appeal.

389.　　S.S. is a prevailing party of Case No. 211163.

390.　　S.S. has appealed to this Court the SRO's decision concerning the portion of relief from Case No. 211163 that DOE had appealed.

391.　　DOE unreasonably protracted the final resolution of Case No. 211163. *See* 20 U.S.C. § 1415(i)(3)(G).

392.　　Based upon all case-specific variables, including the relevant *Johnson* factors, the hourly rates of S.S.'s counsel are in consonance with prevailing rates in the community.

393.　　Based upon all case-specific variables, including the relevant *Johnson* factors, the hours billed by S.S.'s counsel are reasonable.

394.　　The costs sought by S.S. are reasonable.

395.　　S.S.'s efforts to ensure DOE's implementation of the unappealed portions of the IHO's FOFD remains ongoing.

396.　　Counsel's reasonable hourly rates have been the same over the entire course of representation, rendering use of such rates inadequate to compensate for the loss of dollar value over years of litigation.

397.　　Prejudgment interest is calculated as: Principal x Annual Rate x (Number of Days / 365). *Makinen v. City of New York*, No. 11-cv-07535, 2016 WL 1451543 *11 fn. 5 (S.D.N.Y. Apr. 12, 2016).

398.　　S.S. seeks fees and costs pursuant to 20 U.S.C. § 1415(i)(3), including the totality of such fees under subsection (G) due to DOE's unreasonable protraction of the final resolutions of the proceedings at issue.

399. S.S. seeks to invoke the Court's discretion to award prejudgment interest at the prevailing federal prime rate, from the date that billing is first provided to DOE's counsel.

400. Pursuant to 28 U.S.C. § 1961, S.S. seeks postjudgment interest to deter any further delay of payment by DOE following any judgment rendered in this action.

WHEREFORE, S.S. respectfully requests from this Court the following relief:

(1)    Annul the October 12, 2022 decision 22-114 of the SRO.

(2)    Find that IHO Cohen was within her authority to fashion the relief that she ordered under the circumstances and following a full, thorough hearing on the merits for which DOE declined to submit any closing statement.

(3)    Affirm IHO Cohen's August 3, 2022 FOFD, with an Order for DOE to identify, locate, and secure a State-approved nonpublic school consistent with the IEP ordered by IHO Cohen, within 30 days of this Court's Order.

(4)    Enter monetary judgment in the amount of $300,000.00 for the injuries and losses caused by DOE's violations of the ADA, calculated as:

   a.  $19,500.00 for the contractual, forborne obligation to Gersh Academy.

   b.  $109,200.00 for the contractual, forborne obligation to Dr. Tsiris.

   c.  $140,700.00 for the contractual, forborne obligation to MCC.

   d.  $30,000.00 for constraints upon T.S-W.'s access, use, and enjoyment of the benefits, programs, and services to which he is entitled.

   e.  $600.00 for scratches, falls, and other physical injury to T.S-W.

(5)    To the extent, if any, that both the Court determines some but not all administrative exhaustion remains necessary and the *Burlington/Carter/Connor*'s hearing has not begun or is otherwise not completed, enter declaratory judgment that:

a. DOE's violation of the ADA includes that DOE has denied T.S-W. the benefits of, or an equal opportunity to participate in or benefit from, the FAPE that DOE must provide all children between the ages of five and twenty-one years of age who have not received a high school diploma. N.Y. Educ. L. § 3202(1); N.Y. Const. Art. 11 § 1.

b. At the time it was made, S.S.'s contingent decision to place T.S-W. at Gersh Academy, with private at-home ABA by Dr. Tsiris, was reasonably calculated to provide T.S-W. the FAPE to which he is entitled under N.Y. Educ. L. § 3202(1) and N.Y. Const. Art. 11 § 1, as well as to meet S.S.'s own obligations toward New York's compulsory education (N.Y. Educ. L. §§ 3201 *et seq.*) and, if deemed necessary, to mitigate the losses suffered by T.S-W. and S.S. by DOE's violations of the ADA.

c. At the time it was made, S.S.'s contingent decision to place T.S-W. at MCC, with private at-home ABA by Dr. Tsiris, was reasonably calculated to provide T.S-W. the FAPE, as well as to meet S.S.'s own obligations toward New York's compulsory education and, if deemed necessary, to mitigate the losses suffered by T.S-W. and S.S.

d. Any issues of equity weigh in favor of directing payment by DOE toward S.S.'s contractual obligations to Gersh Academy, MCC, and Dr. Tsiris.

(6) Award S.S. attorneys' fees, costs, and disbursements incurred in relation to representation in Case No. 211163 and this action, together with prejudgment and postjudgment interest thereupon.

(7) Grant such other and further relief as may be appropriate.

Dated: February 9, 2023
      Auburn, NY

Respectfully,

s/Benjamin M. Kopp

CUDDY LAW FIRM, PLLC
Benjamin M. Kopp, Esq.
*Attorneys for Plaintiff*
5693 South Street Road
Auburn, New York 13021
Tel.: (315) 207-5584
bkopp@cuddylawfirm.com